We'll move to the second case of the day, which is TocMail v. Microsoft, 22-10223. Mr. Martin is here for the appellant. Mr. Shurker for the appellee. Mr. Martin, whenever you're ready. No hurry. Good morning, and may it please the Court. This Court should respectfully reverse the District Court's finding of summary judgment against the appellant based on at least four main points. Number one, each of the subject ads specifically identifies a very specific type of attack. Can I ask you a question of standing before we get to there? Tell me, since we're at summary judgment and there's a requirement of at least some evidence, what evidence is there that your client was, in fact, injured by any of the ads? So, yes, Your Honor. So, Microsoft originally filed a motion to dismiss on standing, which the District Court denied, but under a Lexmark... So, under a motion to dismiss, I get it. The complaint had allegations in there. So, we're now at the summary judgment stage. There's a different burden on you as the proponent here. So, what affidavit, evidence, something that you would consider in summary judgment shows an injury? Yes, Your Honor. Well, first of all, there's a number of cases out there, and Lexmark's the main case on standing, which talks about the zones of interest and then the second element in terms of withholding trade. So, in terms of the case law that deals with injury, it's important for the plaintiff to show that there's a likelihood of injury. So, based on all the evidence that's been submitted, the issue becomes, is there a likelihood that the appellant would have lost at least one customer due to the false advertising by the defendant? So, here, again, in a two-player market, which is what we have here, we have the appellant and the appellee that both promote, they're the only two, they're the only two companies that promote protection against the specific taxed issue here. The case law says that you, in a two-player market, injury would be presumed, because if the one party is falsely advertising that which only the other party provides. Tell me the case that says exactly that, that in the summary judgment context, in a two-player market where there's two sides, one falsely advertises, one doesn't, that we presume injury. I'm interested in that. So, our summary judgment briefs in the lower, at the district court level, went into depth on this. So, there's tons of cases, but there's Hard Candy, which is the 11th Circuit case that discusses injury being separate from damages. But in terms of some of those cases that discuss two-player markets, you have Merck, which is 760. Hard Candy is not a false advertising case, though, is it? Yeah, they dealt with false advertising issues, yeah. In Merck, there was a two-player market, that's 760 Federal 3rd 247. They said injury is established in a two-player market. That's actually out of the Second Circuit from 2014. There's also the Alpo Pet Foods. Again, all these cases were cited in our brief at the lower court level in more depth. There's also a case that's Obesity Research 310 Federal Sub 3rd 1089 that we cited, where it states basically a lack of sales, which is what our client, what my client, you know, admittedly has. A lack of sales is actually consistent with the injury that they're being shut out of the market. The problem, though, is, as I understand it, your client opened up shop and then sued like five months later. And in that time, made like $4,500 in advertising and marketing costs. So what efforts were made? You can't just open up and say, I have the same product, and they're the behemoth, and they're misadvertising, and so I'm losing customers. Can you? Is that how it works? I mean, so with that, you have to understand that my client obtained a patent for its software. So this had been in the works for a long time. He was waiting on the... Oh, I don't blame or regret your client at all. I'm just saying what the fact is, is as I understand it, you open up shop in December of 2019 and you sue in February or March or April of 2020. Do I have that wrong? That's accurate. Yes, that's correct. So what avenue would be there to sell this pretty expensive product? Because the consumer market's not what you're going for. You're going for the big dogs, right? You're going for the big companies. So where would there have been even an avenue to sell? Especially where you're not even paying any marketing, as I understand it, any marketing money. Well, again, so you're dealing with one of the most common attacks out there, which is eBay, that even through all the evidence that we've submitted separate, Microsoft has had trouble coming up with a solution for, right? That's what this whole case is about. So when my client came to market with a patented solution, this was the only one on the market. So yes, in a two-player market where there's obviously a lot of cybersecurity companies out there, Microsoft was the only one promoting protection against this particular attack. So when TalkMail has a patent for the only solution to solve this attack, yes, it should have been able to market this product because... The question is, did it? But was there any evidence about the scope of the ads that are at issue here? So I'm not talking about the falsity of them. I'm meaning, how many people actually saw the pitch deck or how many people actually saw the PowerPoint presentation? Well, yeah. So there was an email that... So for the 2015 original promotion, which is deceptive message number two, that was actually sent to every single customer in Microsoft. So we cited that. That's actually in the record in one of the emails. What about starting in 2019? So in 2019, yes. I mean, you're talking about the ATP product guy, right? That's obviously sent to all of the customers who purchase ATP. This is on their website where this is how they promote SafeLinks, and this is what it's used for. All right. Now, I want to get more to the merits of it. So I have a question about, and this is out of ignorance, about... You mentioned the word evasions. There are different types of evasions, are there not? Correct. Okay. So tell me what time-based evasion is. Well, time-based evasion is going to be a little bit different from IP. I know it is. That's why I'm asking the question. So IP evasion, obviously using the IP addresses, that's how the attacker... Please answer my... Yes. Counsel, you have a little time. Answer my question. What is a time-based evasion? So time-based would be different from that. The attacker can set it up so it can happen at a later time. So maybe like three weeks down the road... I just want to be clear. It's delivered in a way that is non-offensive or what I'll call good link. It sits as delivered in my inbox as a good link, and at some point, there's like a ticking time bomb, it goes off, and the link becomes bad link. Is that fair?  All right. And now to the question you want to answer, which is tell me how that differs from IP evasion. So yeah, with IP evasion, the attacker is using the IP addresses, and that's what this case is about, is the attacker identifies Microsoft Security Scanner's IP address, because they're published, and then is able to leverage and implement this attack based on identifying the user's IP address. Okay. So with that framework, because I think that framework is really important, let's go through the ads. So message one, what you all have termed message one. With SafeLinks, we are able to protect users right at the point of click by checking the link for reputation and triggering detonation if necessary, right? Correct. Okay. Doesn't Microsoft's reputation and detonation software under what you call ATP, the advanced software, look for reputation at the time of click and detonate at the time of click to do a check? Yes, that's correct. But it also states that we are able to protect users. And that's kind of the gist of why the ads are unambiguous. So can I ask you a question about this then? I don't think I quite understand whether your theory is that Microsoft promises 100% protection and only delivers some, or promises some protection and delivers none. Which of those two things is it? So, and that's kind of the gist of why the ads are unambiguous, because they promote at least some protection. The level doesn't matter. So we had substantial record evidence that SafeLinks provides 0% protection against these very attacks that are- Across all time periods at issue in this case? Because I mean, like, what's your best evidence for after they move to Proxify in 2018 that there's no protection? Sure. So first of all, IP anonymization is what they refer to with Proxify that they came up with in 2018. That's the supposed solution. But there's the email that we've that Microsoft admitted internally that these exact attacks, these redirects, weren't going through Proxify because they returned 200 status codes. So we asked Amar Patel at deposition. He's Microsoft's cybersecurity expert. He's also a Microsoft employee. He testified that that is the criteria, that that's accurate. That is the criteria Microsoft used all the way through at least the first quarter of 2021. The problem is, for me, you want to focus, and I get why you want to, on IP evasion only. But there are other kinds of evasion. Is it not true that they protect against, we'll call it, for example, time-based evasion in checking the link at the point of click for reputation and triggering a detonation? Well, yeah, I mean, there are different types of evasion, but- Do they protect against that type of evasion? Yes, but like- Let's stop at the yes. So I appreciate the yes. If they do, then there is some protect, to go back to Judge Newsom's question, there is some protection. Yeah, but that's why there's substantial record evidence that there is actually 0% protection. So it doesn't matter what- Against any kind of evasion? No. There's no protection against any kind of evasion? That's correct. So, for example- Counsel. Okay. Yes. Now we need to go back to first premises. Tell me again what a time-based evasion is. Again, the time-based evasion is where the attack is decided to occur at some point in time in the future, at that time. Does this not protect against time-based evasion? I'm speaking just for message one right now. It clicks for reputation, so it looks at the link after the time bomb has gone off, and sees if it's okay, and then detonates it to make sure it doesn't forward to malware. Does it not protect against time-based evasion? Well, no, I wouldn't agree with that analysis because the time-based evasion could be set for two months down the road. Right, but it does provide that protection at the point of click, does it not? Well, again, if you look at ad number one, does it not protect, does it not, so going back to Judge Newsom's question, is it not some protection for some kinds of evasion? I mean, yes, that technically could be construed for time-based evasion. We're here for technical, literal truth. I mean, that's it. That's what this is about. So, if it's technically right, then it can't be technically false or literally false. So, yeah, and I go back to message number two and three because the if you look at message number two and three, and admittedly, message number one is probably the weakest message. Okay, so let's look at message number two, and we're already past time, so I want to, let me focus here, please. So there, I'll read the relevant portion. Attackers sometimes try to hide malicious URLs with seemingly safe links that are redirected to unsafe links by a forwarding service after the message has been received. Isn't that time-based evasion? No, Your Honor, this is specifically referring to redirects, so that would be accomplished through IP evasion. Isn't it also redirects done through time-based evasion? That's the whole point of, it changes the nature and then redirects it to something else. Isn't that exactly what a time-based evasion is? So that's going to be a slightly different issue because, again, that's the attacker setting it up where it's going to happen at some point in the future. Right. A specific time, so it could explode, you know, three months down the road. Why is that not, could be read? And that's all that, if it could be read this way, then it becomes a problem for you as discussing time-based as opposed to IP evasion. But again, Your Honor, because there's substantial record evidence that all types of evasion were bypassing Microsoft, so there's numerous things in the record. It doesn't matter whether you say time-based, network, whatever you call it, there's substantial evidence that all these things were bypassing safe links. So that's why— Show me where in the record it says for time-based evasions post-2019 that there was zero protection. So again, okay, so for example, 9745, there's a Microsoft email where they're disclosing a campaign and they don't, they just call it evasion. They don't say it's time-based or network. Okay, they say it's evading us with 100% accuracy. This was a campaign sent to 200,000 recipients. They then went on to say we have an evasion technique. Again, they're not differentiating between network or time-based. They call it a gap and say we're currently missing 100% on them. Okay, so that's 9745. Even in that email, they said some of these details, like the evasion rate, I don't think we should pass those back to the customer. Okay, then you have— Counsel, counsel. Yes. Was, in December of 2019, did the product protect for some kinds of time-based evasions? No, so if you, again, if you go, okay, so 97— The email you just read doesn't say that it has zero protection for time-based evasions. Well, it doesn't, again, it doesn't differentiate between the evasions, but time-based evasion was actually identified in 9753, which is a May 2020 internal document. They said there were still numerous false negatives that are going undetected as they're being evaded in the detonation environment. Attackers are preventing our ability to see the phish content landing pages due to various types of evasion, and they specifically referenced time-based evasion in that document. They said they're still not able to catch, again, this is in— Yeah, numerous. There are some that they're not catching, right? When they say, they go on to say, here are two prominent gaps. This is in there, and they actually say, we're working on the IP anonymization solution. Email? Says, what's that? What's the date of the email? Oh, this is in May 2020. It wasn't an email, it was an internal Microsoft document where they're discussing problems, issues with it. They say, attackers are preventing our ability to see the phish content landing pages due to various types of evasion techniques that are employed. They say, here are two prominent gaps. A URL submitted to Sonar for detonation contains a redirection. They then go on to say, we missed it because of either IP or time-based evasion. They actually say that they're missing, so it doesn't matter. Again, I think that we're looking at a distinction here that doesn't really matter with the type of attack and the promotion because IP anonymization is not catching any of it. All right, just a blocking and tackling question before you sit down. I just want to make sure that I've got this straight now. No part of your claim depends on an allegation on Microsoft having claimed that it can provide 100% protection. That is just not what you're here about. I want to make sure that's right. That's not entirely accurate also because ads number two and three do say that they protect every time, right? So we think that's clear and unambiguous. The district court relied on some external documents to say, Microsoft promotes that they don't protect 100% against all attacks out there. So there could be millions of attacks, right? So Microsoft can say, well, we don't protect against all attacks. Counsel, which ad in ad number two? Start message two. Yep. Show me where it says, counsel, show me where it says in message two. The ATP safe links feature proactively protects your users if they clink such a link. That protects remains every time. Okay, so in that same, which docket entry are you reading? That's for message number two. I'm actually reading from the district court order, but that's in 97-1, 97-36. So 97-1 also says, it clarifies, quote, that advanced products provide, quote, additional protection against specific types of threats. So there it's additional, meaning not all, but additional to what is there, and specific types of threats, not every threat. Does it not say that? Yes, but so for this, every time, there's referring back specifically to this particular attack. That's what they're referring to. They're promoting we can protect against this. Counsel, we have to look at this in context. Does it not say exactly what I just quoted to you? Yeah. Okay. Now let's go on. In 97-36.5, which is also what you've said is part of message two, it says advanced, quote, helps safeguard your organization from harmful links. Does it not? Yes. Again, though, that's back to a reference to all malicious links in general. This safe links is promoted against. At pay, at docket entry 97-69, at three, advanced, quote, helps us improve our built-in security capabilities. Correct? Correct. Counsel, where the context of this is clear that it provides additional protection, helps safeguard, and helps us improve, can it be read in context as requiring 100% protection? For this specific attack, I do believe that it can. But regardless of the... So I guess the point is with the evidence that we submitted with our summary judgment briefing, there's substantial evidence. It doesn't matter if you have one layer, multiple layers of protection. They're all bypassing. The IP evasion that's being done is... So, counsel, this is why you have to answer Judge Newsom's question, which is a vital one. Yes. Is your claim that the falsity is that they're saying there's 100% protection, or is it that they're providing some protection and, in fact, there is none? No, we do not rely on there being... We're relying on them promoting some protection, any protection at all. And there's record evidence that safe links actually provided 0% protection. So, no, we're not relying... That clarification is very helpful. Yes. Thank you. All right. We've carried you way beyond your time, but you've got your full rebuttal time remaining. Mr. Sherker, let's hear from you. Thank you, Mr. Chairman. May it please the Court, Elliot Sherker on behalf of Microsoft. Microsoft's advertisements are not literally false. Can I ask you just another kind of blocking and tackling question, I guess? And it's teed up by the way the parties here have disputed the applicable standard of review. Did the district court sort of do it wrong here? It seems like this was a summary judgment proceeding that turned into her making finding on top of finding on top of finding. Was that appropriate at summary judgment? Your Honor, I've got the district court order right here, record 127. I don't see findings of fact. Well, I mean, so she says at page 10, upon review of all the ads in their full context, the court finds that the allegedly deceptive messages are not literally false because they are ambiguous. That's correct, Your Honor. That's exactly what it says. And that's entirely appropriate on summary judgment. The court is looking at the ads. But is literal falsity a question of fact? Your Honor, I've scoured the summary judgment jurisprudence on exactly that question, and I don't find a rifle shot answer to be perfectly frank. But I see it as no different than any other issue in a case as to which the evidence points in only one direction. And the evidence points in only one direction on literal falsity. So I think what you're saying, which I think is not at all unfair, is that charitably read, what she really means is that there simply is no genuine issue of material fact with respect to whether these ads are literal or false. That's correct. That's correct. Can you answer my standing issue? Is it enough simply to be a competitor in a two-person market to presume injury or to establish injury at summary judgment? Your Honor, I refer the court to our summary judgment motion. It's record 115, and this argument appears at pages 11 through 13. And we dispute that this is a two-player market to begin with. We think that's self-aggrandizement, if you will, on behalf of talk mail and point out that there are a number of players in this field. And, of course, everything that Your Honor asked my opponent is entirely based on the record, that is, that this was a total of some small sum spent on advertising, never entering the market, never selling, never doing anything except suing us immediately on the Lanham Act theory. But as to the legal rule, do you agree or disagree that in a two-player market, injury is presumed? Your Honor, again, referring the court to the summary judgment motion where we address the nature of a two-player market, I don't see any basis for applying that principle here. Yeah. I guess I'm just asking two questions. One is about the legal rule. You know, do we presume injury in a two-player market? The second question is, is this a two-player market? I get it that you dispute the latter. I'm just wondering if you dispute the former. No, Your Honor. Fair enough. So, Mr. Sherker, let me, I tried my best to go over the ads that I, some ads with your opposing counsel, but I want to talk about one ad that I'm a little troubled by, and that is one of the ads in what you all term as Message 3, and that ad is the one that says that Advanced ensures document hyperlinks are harmless with ATF safe links. And this is that if we're, if you want to, if we want to look at the docket entries, this is docket entry 4210, that, the one that I'm reading from. Yes, sir. It appears elsewhere in the record as well. So that one doesn't have the protect language, because I'm, I understand the argument with regard to protect. Protect to me does not say we are 100% assuring, it's we're putting a fence around you, but people can jump over the fence sometimes. But this one seems a little more emphatic to me. Explain to me how I'm reading this wrong or how in context I should be reading this. Let me start with context and then back my way back into the ad if I might. The testimony is, and when the court looks at the documents. So can I stop you right there for a second? And I want you to answer the question, but I'm troubled by the reliance by all sides on testimony when we're looking at, as I understand it, whether something itself in the context in which it's there is literally true or false. In other words, I don't think we look at extrinsic evidence in the same way we would extrinsic evidence in an unambiguous contract for determining what it means, if it means what it says. So if you can start with the context of the ad itself and maybe do concentric circles out from there, that would be helpful. The context of the ad is it's directed at IT professionals. And I was going to refer the court, for example, to document number 9736, which is another ATP brochure. And when you go to page 12, where the discussion is how to buy the product, it's an enterprise product. It's sold to large corporations. You can add it for $2 a user. It's not advertised in USA Today for sale to individual consumers. Is there anywhere within docket entry 42-10 itself that indicates that it's directed solely at professionals as opposed to the public at large? This was a slide presentation at Pitch Deck. And the, again, if I might advert to the testimony from Mr. Patel, because he was involved in the preparation of these documents and their use, they are aimed at IT professionals in large corporations, all of whom know that the threat dynamic changes virtually every day, and all of whom know, as Mr. Patel testified and as Microsoft maintained in the district court, that declaring the war to be over is foolishness. Do we look at the subjective understanding of the listener, or do we look at how objectively they would, any reasonable user would look at this? What's the test for us? First, we have to have the market in which it's aimed. And a reasonable IT professional knows there's no such thing as 100% protection. There's no such thing as a guarantee that you'll be able to stop malware and phishing. I understand that intuitively. That makes complete sense to me. And maybe that is the right answer. But I just, when you're looking at page six, and it says, so detect issues before they happen, ensure document hyperlinks are harmless, not qualified with the type of evasion that's used, but that ensure, meaning to make sure, that they are harmless. Let's look at message number three, then, Your Honor. Because message number... I'm looking at message three. The record says more than that. Well, which, so there's three, there's four threes. I'm only looking, and this is why I was specific. So I agree with you. There are other message threes that have way more context to them. I'm looking at 9730, Your Honor. Okay, I've read 9730, and let's just say I agree with you. But the problem is, 4210 is a different document with a different, that was presented differently. And I'm reading just the beginning to end of 4210, and I'm having trouble seeing anything else that would qualify that. I'll tell you what I think might be your best answer to that, at least within the document itself. And that's at page nine, where it says, it says, protects against threats the most trusted and secure way to protect against cyber threats, which would seem to qualify somewhat the absolute certainty of ensure links are harmless. Which is exactly like 9730, again, using the word protects. But the district court ruled is that this is at best in context of its audience, ambiguous, and therefore cannot be literally false. It's not our burden to show that it's literally true. Although I think we would satisfy that burden as to number one and number two, certainly. Because they are literally true and therefore not literally false. But on ad number three, all we have to prevail on is, is it ambiguous in context? Microsoft tells the world, Microsoft tells the world that there is no such thing as 100% protection. Microsoft tells the world that one should proceed with an assume breach mindset. That's a direct quote from another document that includes the same sort of language. I just, I worry about, and I think the district court ran into some of this. I think that might be part of what Judge Newsom was asking about right up front. Johnson & Johnson tells us that we really have to look at these sort of individually and we can't collapse them unless there is evidence in the record that the public itself would have consumed these ads all together at once. And I don't see that in the evidence. But if I'm wrong, tell me. Your Honor, I think my opponent is overreading Johnson & Johnson. For one thing, after this court made that observation, Judge Anderson went on to review each ad individually. Right. In context. So it's hardly a fatal flaw. But if you have two ads that say the same thing, for example, one and two, say the same thing, is it fundamental error for a district court to say these two ads are not literally... But I think the trick is, can one and two inform three? That's right. Well, I'm afraid the district court did. Judge, I don't read it that way. The language that the district, what the district court focused on is exactly what I've been talking about this morning. And of course, the review was de novo. But what I'm focusing on this morning is what I believe the district court was getting to. Looking, take ad number three. Isolate it out from ad number two. Apply Johnson & Johnson super strictly. And you have the word ensures. And does the word ensures mean a guarantee of 100% protection in context? And I submit it is entirely fair when looking at context to look at the intended audience and to look at everything else that Microsoft tells the world and tells that intended audience. So, Judge, look, it may be intuitive that IT professionals know that there's no such thing as 100% protection. But when Microsoft tells the world there's no such thing as 100% protection in public-facing documents, I think they're advertisements to that specific IT community. Because remember, we have no evidence of deception at all by anything Microsoft said or did. We're going strictly on literal falsity. That's where my opponent has chosen to rest their claim. And that's where they have to succeed. And they cannot show that the mere use of the word ensures in the context of, for example, this iteration of message number three, where it says protect against sites with malicious contact phishing sites. Protect your email in real time against unknown and sophisticated attacks. That the word ensures would leap out to a sophisticated IT professional and say you're guaranteeing 100%. My worry is that while I agree with you as to that version of message three, the version that I asked you about doesn't have a lot of that. It has the one sentence I read, but it doesn't have that other qualifying language that I think does exist in almost every other spot. And, Your Honor, that's consistent with the context in which these ads exist. It isn't a full page ad in a newspaper of general circulation that says consumer, buy this feature because you can't, but buy this feature because it ensures you're protected against phishing attacks. That would be an entirely different world. This is part of a pitch deck to IT professionals who go into it existing in that world. What's the best case for you that we look at this not as the public at large, but to the audience to which the ad was presented? Your Honor, I'd rely on the general case law about context because that requires a reasonable look at where the ad exists. If the ad exists in one daily newspaper in Fiji and doesn't reach anybody else, that's part of the context. So here the context is the audience. And I don't think we have to uncomfortably rely on testimony when we have the expert testimony from Microsoft's witness that this is who we're aiming at. I prepare these. This is our audience. And you can't read these documents without knowing that they're directed to a very sophisticated audience because most of us, myself included, when I first read them, didn't understand half the words that were used in the advertisement itself. Okay, can you address the, so let's assume that I agree with you on everything you've said so far. Your opposing counsel says, that's not really our argument. Our argument is that there is zero protection. And so any promise of any protection at all is false. Your Honor, that's just wrong. I don't know any other way to say that because what they're doing is they're taking one tactic, one cyber attack tactic. The IP evasion. And that's what it is. And when you look at their own statement of material facts, which was record 110, they say that IP evasion uses redirects, redirection. It's not that IP evasion is the sinquanone of a redirect. A redirect happens if you open up a newspaper on your computer and click on the link to the story. That's a redirect. It's not a malicious redirect, hopefully, but it's a redirect. What we protect against is malicious redirects. Now, IP evasion, as the record shows, is one form of a redirect. And as it happens, Safe Links does provide, and the testimony is unrebutted, that Safe Links does provide protection against IP evasion. If it's a known bad site, it'll get caught in the reputation blocking. Detonation in the security scanner can catch IP evasion. But when IP evasion first reared its ugly head as a problem for Microsoft users in 2018, that's when we develop IP anonymization. That's when we develop, we use Proxify to route the traffic away from Microsoft sites. And the unrebutted testimony is Proxify is 95% effective. So this is a misdirection, not a redirection, by the other side. To say that all redirects are IP evasion, Safe Links provides no protection, zero protection against IP evasion, and therefore Safe Links does nothing. That's simply nonsense. Can I ask you a quick question? If we are subdividing the world of evasion, is there a period in time in which Microsoft admitted pre-Proxify that it was offering essentially no protection with respect to IP evasion specifically? No, sir. The unrebutted testimony on Safe Links itself is first of all, the reputation blocking has this gigantic cache of known bad sites. And if a known bad site is using IP evasion, it's going to get caught by the reputation blocking regardless of the tactic in the cyber attack. There's further testimony from Mr. Patel, an unrebutted testimony, that the detonation function, the so-called sonar function, can catch IP evasion. I will acknowledge that Safe Links wasn't devised in 2015 to go after IP evasion. It wasn't known to be a problem, according to the testimony in 2015. And that's why Microsoft, as we've maintained throughout, continues to develop new tactics as new forms of phishing and cyber attacks crop up. So our answer to IP evasion was Proxify. But it is not so, Judge Newsom, that we ever acknowledge because it's simply not true that Safe Links provides zero protection. What about the no solution evidence? Microsoft didn't have a solution to IP evasion before late 2018. We did not have a targeted solution. That's correct. And that's exactly what IP anonymization is, because it moves the links away from Microsoft's IP addresses, moves the messages away from Microsoft IP addresses and moves them to Proxify. And that allows, as Mr. Patel testified, that allows them to see the bad payload in that process. So that was designed, and it's 95% effective, to go after exactly this problem. So between 2015 and 2018, Safe Links was doing what Safe Links does. As we continue, the record shows ample discussions among the IT professionals and security professionals at Microsoft that they're continuing to monitor new threats and develop new techniques. That's exactly what we did. But this entire zero protection argument is simply baseless on the record and proceeds from a completely flawed premise. Okay, very well. Thank you very much. We've carried you beyond your time. Mr. Martin, you've got five minutes of rebuttal time remaining. Thank you. I'm going to start with the 95% protection because in 2018, Microsoft acknowledges that's the first time they had a solution. So the ads have been in place since 2015, right? So they're acknowledging that we didn't have a solution at least until 2018. That 95% protection that Microsoft's referenced was solely from a deposition testimony where one of their employees said we had 95% protection once IP anonymization came in place. But again, the record evidence demonstrates that that's not true, that IP anonymization was not used for the redirects it is. But counsel, the issue is that, so I'll go to the one I've been asking your opposing counsel about just because in fairness. So I actually think it's the hardest case for your opposing counsel and the best case for you, which is 4210. Did I have that right? Sorry. 42-10, right. I should trust my memory. Because there, there's the least amount of context in the ad itself. But there, all that they're saying is it ensures document hyperlinks are harmless with ATP safelinks. If your position, as I understand it, is that you're not staking your flag on that requiring 100% protection, you're saying that it at least intimates some protection, literally being the case, and there was in fact none. This only applies to just hyperlinks in general. And there are all sorts of evasion techniques regarding that for which, as I understand it, ATP was effective. Is that, is that not the case? Well, so what you're referring to like kind of a subset of message number three, but message number three also in 9730 is stronger than that. And that's what the district court cited. But that's where it says, ensure users are protected against URLs that redirect to malicious sites. Safelinks will proactively protect your users every time they click the link. So, okay. So, but here's the problem with 97, this is why the one I cited is better for you, but I'll go to the one you want to talk about. Because that one says this. It says on, this is on page four of the PowerPoint. So page four of the CMSCF page. Reduce threats in big, bold letters under the headline of advanced threat protection. Reduce threats and increase awareness. I mean, reducing threats by itself, literally says that there are threats to which we cannot do anything for and having this product will reduce that. Again, and then again, your honor, I think, I think this, this is what Microsoft's argued, but it's referring specifically to all. This is not what, yeah, whether it did or did not argue is not the question. The question is in my requirement under Johnson Johnson, which I take seriously, is to look at each ad individually in context. I have done that. I have read word for word, every one of them. And what I'm asking is that ad says, no more than this product reduces the threats. It doesn't make the assurance that we're talking about. And if we read it all together, which we're required to do, it would seem that all it's saying is there's a reduction. Yes, but a disclaimer that we don't protect against all threat or we reduce only some of them isn't disavowing or taking away from the fact that they're promoting protection every time against this specific attack. So that's where the distinction comes is Microsoft's continuously promoted, and they do, they promote, we can't protect 100% against all attacks. But they can say, well, for this one attack, we do protect, we do protect 100% of the time. We do say that every time they click a link. And again, we're not even relying on that for purposes of reversing the district court's order. But that's what this says. So these general references to, we don't promote 100% protection, we would never promise 100% protection. That's true as to all malicious attacks in general. There could be millions of them. Here's the quote from Chief Security Officer of SunGuard. Safe attachments in EOA threat protection is going to reduce zero-day threats from malware and viruses. Exactly what we're talking about, by the way. This will help prevent malicious attachments from impacting our environment. Now, I agree that deals with attachments and not links. But the whole premise of this is that you're going to get a better product and a good product. Not 100% protection, is it? And again, Your Honor, for purposes of what we're relying on, we can all agree, the ads do promote some protection. So with the fact that there's record evidence that SafeLinks provided zero protection, summary judgment was certainly improper. Is it zero protection for all links and all kinds of malware attacks? Yes. So all evasion. You're saying that it was ineffective for every single kind of evasion. So the evidence we have is evasion, or whatever the attack is, they're getting past the customer. So like in the 200,000 email I referenced, there was 200,000 emails that were attacked. So you can call it what you want. They bypassed every layer. The attacker used what it used and was able to reach the customer. So in that scenario- That's not every time in every kind of evasion, is it? Again, I think that the type of what you call it is irrelevant because 100% of the time it reached, they say it reached our user 100% of the time. We are missing 100% of these. So again, the distinction is, you know, it's not as necessary whenever you have 0%, but that's not the only evidence that we have. There's substantial other evidence in the record that shows 0%, such as Dr. Babnabu, who's an independent third party, who wrote to Microsoft and said, we're evading you with 100% accuracy. There was also, again, the email that the doctor and I referenced in May 2020 did specifically reference time-based evasion. So at the summary judgment level, where the district court improperly weighed this evidence and made the determination, because again, the ads on their face, and I think you alluded to this earlier, the district court actually relied on deposition testimony from Microsoft's employee to interpret the ads. But we can look at the face of the ads themselves to see they communicate some protection. We all agree on that. So they can be judged. So they're not ambiguous, because they can be judged true or false. They can be judged if they do provide some protection, then if that's the argument, then they could be true. But if they provide 0% protection, they'd be false. Okay. So they clearly can't be ambiguous. Yeah, I think we've got it. Thank you so much for your presentations. Well argued on both sides. The case is submitted. We'll go to case number three for the day.